IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| RAYMOND BARRY BISHOP, | ) Civil Action No. 3:05-3612-JFA-JRM |
| Plaintiff, | ) |
| vs. | ) |
| THOMAS & HOWARD COMPANY, INC., | ) **REPORT AND RECOMMENDATION** |
| Defendant. | ) |

Plaintiff, Raymond Barry Bishop ("Bishop") filed this action on December 30, 2005. On January 18, 2006, Bishop filed an amended complaint. Bishop alleges claims under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA") and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq.[1] Defendant, Thomas & Howard Company, Inc. ("T&H"), filed a motion for summary judgment on April 9, 2007. Bishop filed a response on May 17, 2007, and T&H filed a reply on May 24, 2007.

SUMMARY JUDGMENT STANDARD

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Id. Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987). This does not mean that

---

[1]Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this report and recommendation is entered for review by the court.

summary judgment is never appropriate in these cases. To the contrary, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits (see Fed. R. Civ. P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin

v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Servs. Co., 80 F.3d 954 (4th Cir. 1996).

## FACTS

1. T&H is a privately owned food distributor headquartered in Columbia, South Carolina. The company operates three facilities in South Carolina providing full line, full service distribution to convenience stores and restaurants which are primarily located in South Carolina, North Carolina, and Georgia.

2. Bishop, who was 41 at the time (born in December 1958), was initially hired by T&H on June 4, 1990 as a sales trainee. Bishop Aff., Paras. 2 and 4.

3. Norman Eugene (Gene) Poore ("Poore") was employed by T&H from March 2002 to April 2005, first as a Vice President of Operations and later as the Newberry Division President. Poore Dep. 8-10; Poore Aff., Para. 2.

4. After approximately six months, Bishop was given his own sales territory and became a District Sales Representative ("DSR"). His sales territory consisted of Columbia and Orangeburg and small towns located in between these cities. Bishop's duties consisted of making calls on customers and selling company products. Bishop Aff., Para. 5.

5. As a DSR, Bishop was supervised by Rhett Fellers ("Fellers"). Fellers Dep. 21.

6. Bishop had several performance issues as a DSR which are discussed below:

   a. Bishop was counseled in March of 1994 for failing to update a customer's contract, causing discrepancies in sales. He was also counseled regarding his failure to meet sales and profit goals. Bishop was told that his performance must improve. Bishop I Dep.[2] 15 and Defendant's Ex. 3, Fellers Dep. 25.

---

[2] References to Bishop's deposition taken on January 15, 2007 are referred to as "Bishop I Dep. ___."

    b.    On January 23, 1995, Bishop was counseled regarding his failure to follow collection and deposit procedures. Bishop was warned that any further deviation from these procedures would result in discipline including termination. Bishop I Dep. 16-17 and Defendant's Ex. 4, Fellers Dep. 25-26.

    c.    In May of 1995, Bishop was again counseled regarding his failure to accomplish sales and profit goals. Bishop was informed that his sales numbers must improve. Bishop I Dep. 17 and Defendant's Ex. 5, Fellers Dep. 26.

    d.    In June of 1996, Bishop received a Performance Appraisal showing that he needed improvement in five out of ten areas, and was performing in an unsatisfactory manner in three other areas: Productivity, Independence, and Initiative. He was only meeting T&H expectations in two areas: Adherence to Policy and Interpersonal Relationships. Bishop I Dep. 18-19 and Defendant's Ex. 6, Fellers Dep. 26-27.

    e.    On June 25, 1996, Bishop again received counseling regarding his deficient performance as a DSR. In this meeting, T&H again questioned whether Bishop was suitable for a position as a DSR. Bishop I Dep. 20 and Defendant's Ex. 7.

    f.    In December of 1997, Bishop was counseled for falsifying his expense report. Bishop admitted falsifying this report. Bishop I Dep. 21 and Defendant's Ex. 8, Fellers Dep. 27.

7.    Bishop served as a DSR until November 1998. His sales territory was closed at that time. Bishop was offered the position of sales assistant, which he accepted. As sales assistant, Bishop worked all of the sales territories, filling in for other salesmen when they needed assistance, were sick, or on vacation. Bishop Aff., Para. 6[3]

8.    In 2003, 2004, and 2005, T&H's business was significantly impacted by the loss of several accounts, most significantly its account with the Bojangles' restaurant chain, necessitating the elimination of numerous jobs. Poore Aff., Para. 3.

---

[3] The parties dispute the reason for the change. T&H contends it was because of a lack of sales in the territory based at least in part on Bishop's performance. Bishop claims that it was because of a trucking problem that forced the closure of three districts, including his, and claims that his removal from this position had nothing to do with his performance. Bishop Aff., Paras. 7, 10-11.

9. Lois Shealy ("Shealy"), T&H's Payroll Administrator and custodian of T&H's employment records, states that T&H laid off 54 employees in 2003. The majority of these employees were under 40 years of age at the time of the layoff. Shealy Aff., Ex. 1.

10. T&H refocused its attention to "street business." This involved targeting new accounts that were not chain restaurants, instead focusing on small individually owned restaurants, hospitals, and schools. Poore Dep. 29; Poore Aff., Para. 4.

11. Poore determined that T&H needed to increase its sales force to solicit new business. This involved hiring more DSRs and training new DSRs.

12. On approximately November 27, 2003, Bishop learned that he had a cancerous tumor in his colon. Bishop had the tumor removed and returned to work approximately two weeks after he was released from the hospital. Bishop I Dep. 60, 62 and Defendant's Ex. 13, page 1.

13. On January 8, 2004, Bishop's physician signed a form excusing any of Bishop's absences from November 27, 2003 to January 11, 2004, and restricting Bishop from heavy lifting. He noted that he would review Bishop's status in three weeks. Bishop Dep. I Defendant's Defendant's Ex. 13, page 1.

14. Bishop suffered complications which required him to have a second surgery in late January or February 2004. Bishop Aff., Para. 15. On February 23, 2004, Bishop's physician signed a form excusing any of Bishop's absences from January 23 to February 25, 2004. The physician stated that Bishop was to be placed on "[v]ery light duty - sitting at desk." Bishop I Dep. Defendant's Ex. 13, page 2.

15. Poore made at least two comments to Bishop about Poore's father having colon cancer and that Poore's father died of colon cancer. Poore also stated that T&H was mindful of

Bishop's condition. He told Bishop that he did not want Bishop going on long trips or doing any heavy lifting.[4]   Bishop I Dep. 30.

16. In early May 2004, Bishop began undergoing a second round of chemotherapy which continued until September 2004. Bishop Aff., Para. 25.

17. T&H determined that it was more efficient to have four districts in South Carolina instead of two and to have one sales trainee and one DSR for each district to allow the sales trainees to work closely with the DSR and for those employees to became more familiar with the street business in a smaller territory. Poore Aff., Paras. 5-6; Fellers Dep 32.

18. T&H eliminated Bishop's sales assistant position and had sales trainees responsible for performing those duties as well as training to be DSRs. Poore states that Bishop was not considered for a sales trainee position because Bishop had already trained as a DSR and failed to perform in that position. See Poore Aff., Para. 7; see Fellers Dep. 32-33.

19. T&H offered Bishop a Customer Services Representative ("CSR") position in mid to late May 2004, which Bishop accepted on June 1, 2004. The pay scale for the position was less than Bishop's rate of pay as a sales assistant, and Bishop's compensation was reduced. T&H gave Bishop a four-week period after he accepted the position during which his salary would not be reduced. Poore Aff., Para. 9; Bishop Aff., Para. 18; Bishop I Dep. 27-28, 31, 36, Defendant's Ex. 10.

20. Bishop began training for the CSR position and was scheduled to take the position on June 27, 2004. Bishop I Dep. 36 and Defendant's Ex. 10.

---

[4]Bishop did not specify the time period in which the statements were made.

21. Sometime between June 1 and June 27, 2004, T&H rerouted its delivery schedule to meet customer demands. The reroute resulted in the majority of delivery orders being taken two days a week. T&H determined that it did not need as many CSR employees working the other days (when the bulk of the orders were not being taken). The company decided that it could eliminate two of the full-time CSR positions and replace those positions with part-time CSR positions in which those employees would work only on the two days that the majority of the orders were received. Poore Aff., Para. 10; see Poore Dep. 22-23.

22. After approximately three weeks of training, Bishop took a prescheduled vacation for one week. When he returned he was told that his full-time CSR position was eliminated. Bishop Aff., Para. 20.

23. The parties dispute whether Bishop was offered a part-time CSR position. Bishop claims he was never offered such a position and Poore claims that he offered Bishop a part-time CSR position which Bishop declined. See Bishop Aff., Para. 22; Poore Aff., Para. 13.

24. Bishop's employment with T&H ended effective June 28, 2004. Bishop I Dep. Defendant's Ex. 12.

25. On Bishop's termination form, Poore classified Bishop as eligible for rehire. Poore Dep. 50-51; Poore Aff., Para. 14; and Bishop I Dep. Defendant's Ex. 12

26. In the three months prior to and the six months after Bishop's separation (April 1 through December 2004), T&H hired 24 new employees. Of these new hires, 10 were under the age of 40, 14 were 40 years or older, 5 over the age of 50, and 2 were 56 years old. See Shealy Aff. Para. 7 and Ex. 4.

27.   T&H hired four part-time CSRs between September and November 2004. The ages of these new hires were 24, 25, 26, and 35. Poore Dep., Plaintiff's Ex. 2, Sub-exhibit 10 (Customer Service Changes).

## DISCUSSION

Bishop alleges that T&H discriminated him based on his age and disability by demoting him from a sales assistant position to a customer service position and by terminating him. Amended Complaint at 3-4. T&H contends that it is entitled to summary judgment because: (1) Bishop can neither prove a prima face case of discrimination under the ADEA or produce any evidence of pretext to rebut T&H's legitimate, non-discriminatory reasons for its employment actions; (2) Bishop's claims under the ADA must be dismissed because Bishop cannot prove that T&H regarded him as disabled; and (3) Bishop's ADA claims must be dismissed because Bishop cannot prove that T&H discriminated against him based on a "regarded as" disability.

A.   ADEA

Bishop alleges that he was demoted and terminated based on his age in violation of the ADEA. T&H has analyzed Plaintiff's age claims in four categories: (1) elimination of the sales assistant position, (2) failure to hire for a sales trainee or DSR position, (3) elimination of the full-time CSR position, and (4) failure to hire for a part-time CSR position. Bishop argues that it is unclear whether the prima facie case that he has the burden of establishing is for a reduction in force ("RIF"), failure to promote, or transfer claim, but that he has produced enough admissible evidence to meet his required burden of proof. Bishop then states that he accepts the prima facie framework - one for failure to hire - that is set out by T&H. Plaintiff's Opposition Memorandum at 11.

Under the alternative burden-shifting method of proof of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973),[5] a plaintiff may establish a prima facie case of age discrimination under the ADEA by proving that: (1) he was a member of the protected class (at least forty years old); (2) he was performing his job to the legitimate expectations of his employer; (3) he suffered a materially adverse employment action; and (4) the materially adverse employment action occurred under circumstances that raise a reasonable inference of unlawful discrimination (e.g., that he was replaced by someone of comparable qualifications under forty years of age or significantly younger). See O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308 (1996). If plaintiff establishes a prima facie case of employment discrimination, then defendant has the burden of articulating a legitimate, non-discriminatory reason for failing to promote him. O'Connor, 84 F.3d at 719. If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

A plaintiff can employ the scheme outlined in McDonnell Douglas to establish a prima facie case of discriminatory failure to hire or transfer by offering proof that:

(1)     he is a member of the protected group;

(2)     he applied for the position in question;

(3)     he was qualified for the position; and

(4)     he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination.

See Brown v. McLean, 159 F.3d 898, 902 (4th Cir. 1998); Alvarado v. Board of Trustees of Montgomery Community College, 928 F.2d 118, 121 (4th Cir.1991).

---

[5] Bishop has not alleged that he has any direct evidence of discrimination.

(1) <u>Sales Assistant Position</u>

Bishop alleges that T&H discriminated against him based on age because his sales assistant position was abolished. T&H does not address Bishop's prima facie case, but contends that it has articulated legitimate, non-discriminatory reasons for eliminating Bishop's position, the loss of a significant amount of business, the need to focus on street business, the creation of four sales districts, the placing of a sales trainee in each district to train as a DSR, and the need to eliminate the sales assistant position because the sales trainees could perform Bishop's job in addition to training to become DSRs. In his opposition memorandum, Bishop does not appear to dispute T&H's legitimate, non-discriminatory reasons for abolishing this position.

(2) <u>Elimination of Full-Time CSR Position</u>

Bishop alleges that the RIF as to his CSR position was discriminatory based on his age. T&H contends that Bishop fails to establish a prima facie case as to this claim because he cannot show that the elimination of the full-time CSR position occurred under circumstances raising a reasonable inference of unlawful discrimination. Specifically, T&H argues that the rerouting of delivery orders and change in the schedule of orders clearly supported the decision to eliminate two full-time CSR positions, Bishop was least senior in the position (as he was in training at the time the decision was made and had not officially been placed in the position), and T&H also eliminated the CSR position held by Christina Westgate (who was 26 years old at the time of her separation). T&H also appears to have articulated a legitimate, non-discriminatory reason for its actions, the need to reduce the number of positions because of decreased business and that Bishop was one of the CSRs chosen for layoff because he was the least senior of the CSRs. Bishop does not appear to have challenged these legitimate, non-discriminatory reasons.

(3) Sales Trainee and DSR positions

Bishop appears to allege that he was discriminated against based on his age because he was not transferred or hired as a sales trainee or DSR after either the abolishment of his sales assistant or CSR position. T&H contends that Plaintiff fails to establish a prima facie case and it has articulated legitimate, non-discriminatory reasons for its actions.

(a) Prima Facie Case

T&H contends that Bishop fails to establish a prima facie case because he cannot show that he "applied" for the job of sales trainee or DSR and he cannot show that he was "qualified" for these positions. Bishop fails to establish a prima facie case as to the sales trainee or DSR positions because he fails to show that he was "qualified" for these positions. Poore testified that Bishop was not qualified to be a sales trainee based on Bishop's previous performance as a DSR. In response to the question "couldn't [Bishop] have been retrained," Poore stated that "Bishop had been with the company for 14 years, working in the sales department that entire time, and if he hadn't learned how to be a successful DSR during that time, we felt that this training would not benefit him." Poore Dep. 35. Although Poore testified that Bishop's performance was acceptable as a sales assistant (id.), the sales trainee position involved training to become a DSR.

Bishop claims that his performance as a DSR was acceptable because he performed the job for eight years and the change form (transfer from the DSR position to the sales assistant position) listed the "Reason for Change" as "Close sales territory." Poore Dep., Plaintiff's Ex. 2, Sub-exhibit 7. Bishop, however, has not disputed that he was warned about his performance on a number of occasions, as discussed above. Further, Fellers testified that Bishop had "somewhat" of performance problems in the DSR position and the Orangeburg (Bishop's territory) and Charleston territories

11

were closed in part based on problems with sales. Fellers Dep. 21-22. Fellers also stated that Bishop was never considered for a transfer back to a DSR position. Fellers Dep. 22-23.

(b) Legitimate, Non-Discriminatory Reason/Pretext

Even if Bishop could establish a prima facie case, T&H has articulated a legitimate, non-discriminatory reason for not hiring him as a sales trainee or DSR, that Bishop had problems as a DSR which supported the decision not to consider him for a DSR position or a sales trainee position (because the sales trainee position was intended to train an employee to become a DSR). T&H contends that Bishop cannot establish pretext to rebut its legitimate decision because it hired several DSRs who were close in age or older than Bishop during the same time period. The company appears to admit that the sales trainees hired were younger than Bishop, but that these were low-paying, entry-level positions for which T&H received mostly younger applicants and any argument concerning this is offset by the fact that Poore hired five DSRs over the age of 50 at the same time.

Bishop appears to argue pretext, claiming that he was qualified for the position. As discussed above, T&H has presented evidence that it did not believe that Bishop was qualified for the positions of sales trainee or DSR. "It is the employer's prerogative...not the applicant's, to establish what criteria are relevant to the hiring decision...The employee does not get to write his own job description. An employer can set whatever performance standards he wants provided they are not a mask for discrimination or on forbidden grounds such as race or age." Smith v. American Nat'l Red Cross, 980 F.2d 727, 1992 WL 357850, at *3 (4th Cir. Dec. 4, 1992)(unpublished)(quoting Palucki v. Sears, Roebuck & Co., 879 F.2d 1568, 1571 (7th Cir. 1989). It is the employer's perception of job performance, and not the employee's perception, however, that is controlling. See Dajarnette v. Corning, Inc., 133 F.3d 293 (4th Cir. 1998); Smith v. Flax, 618

F.2d 1062 (4th Cir. 1980); Shore v. A. W. Hargrove Ins. Agency, Inc., 873 F. Supp. 992, 998 (E.D. Va. 1995).

Bishop also appears to argue that the reason is pretextual because T&H, in a letter to the EEOC, described his transfer from the DSR position to the sales assistant position as a demotion. T&H provides that this was a demotion, as the transfer involved backing up the DSRs and did not have any sales goals or budgeted sales. See Poore Dep. 91. Although Bishop may not have considered this a demotion, he simply has provided nothing other than his own opinion to dispute T&H's description of the position.[6]

---

[6] Bishop also appears to contend that he has presented evidence of age discrimination because (1) two employees, Fellers and Ed Kyser ("Kyser"), were asked to retire on their 65th birthdays; (2) Jean Hodges ("Hodges"), T&H's Vice President of Finance, stated that she told Poore that Bishop should not be terminated because it was bad for the company; and (3) Hodges testified that T&H was trying to change the "good ol' boy system" that existed at the company. Hodges stated that Kyser was terminated on his 65th birthday because he had not been contributing to the company and it was a budget thing. The only indication of age was that the company waited until Kyser was 65 in order to allow him to be at the age to collect Social Security retirement benefits. She testified that a replacement was brought in for Fellers with his knowledge and Fellers was training his replacement. Fellers testified that he probably would have not retired for approximately another nine months if he had not been asked to leave, but also stated that his replacement was essentially performing all of his duties at the time of his separation and admits his separation could have solely been a cost-cutting business measure. Fellers Dep. 24, 30.

Hodges thought that Bishop should not be terminated because it was bad for the company as far as morale because "everyone loved [Bishop]" and his termination might create the appearance of being health related. She, however, did not have any part in the decision, testified that she was not in a position to evaluate Bishop's job performance, and she did not have any reason to believe that Poore discriminated against Bishop based on his age or disability. Hodges Dep. 22-23.

Although Hodges testified that T&H was trying to change the "good ol' boy system," she also stated that the term was not about age. Instead, she described the term as being about a system "[w]here basically you can break rules and bend rules and there are no consequences for it." Hodges specifically stated that it did not refer to someone's age and instead described a kind of lackadaisical-type style. Hodges Dep. 13, 21-22.

13

   (4) <u>Part-Time CSR Position</u>

   Bishop appears to claim that T&H discriminated against him by not offering him a part-time CSR position. T&H contends that Bishop fails to establish a prima facie case as to this claim, that it offered this position to Bishop and Bishop declined the offer, and there is no evidence to support an inference that any decision was motivated by unlawful discrimination.

   (a) <u>Prima Facie Case</u>

   T&H contends that Bishop fails to establish a prima facie case as to not being transferred or hired into a part-time CSR position because he declined the offer of such a position and fails to show that he "applied" for the position. Bishop claims that he did not have to affirmatively act to "apply" for a part-time CSR position because of T&H's written policy (in the company handbook) which Poore testified T&H followed.[7] Bishop claims that the policy required T&H to award positions to current, particularly longstanding employees, when the employee had been displaced by a layoff. He also argues that the policy is shown by his having been offered the sales assistant and CSR positions without applying for them. T&H's handbook contains a section titled "SENIORITY/PROMOTIONS, " which provides, in part:

> When vacancies occur, it is the Company's practice to fill them from its present employees when possible. Selections for promotions are made fairly, consistently and impartially based on merit. All of these factors being equal, the longer service employee is given definite consideration.
>
> Our job security depends upon our being competitive in the marketplace and our ability to meet the needs of our customers. Should a lack of work occur, employees in those job classifications affected will fill open jobs, be downgraded or transferred, or be laid off with major consideration given to their departmental and Company

---

[7]Poore testified that to the best of his knowledge the company adhered to the guidelines in the handbook, but that Bishop was not recalled because there was no position for which Bishop was qualified. Poore Dep. 14-16.

seniority. When work is again available, employees will be recalled in order of their departmental and Company seniority to those jobs for which they are qualified.

Poore Dep. Plaintiff's Ex. 1, pages 13-14.

In the light most favorable to Bishop, he has established a prima facie case as he has produced evidence that he did not have to formally apply for other positions based on the handbook policy and the fact that he previously did not have to formally apply for positions. There is no evidence that employees or former employees were required to formally apply for any position.

      (b)  Legitimate, Non-Discriminatory Reason/Pretext

T&H appears to contend that it had a legitimate, non-discriminatory reason for not offering Bishop a part-time CSR position after his termination, that he had already turned such a job down when it was offered by Poore. Bishop argues that he has shown pretext because he was never offered a part-time CSR position. Viewing the facts in the light most favorable to Bishop, he was never offered a part-time CSR position. Although Poore testified that he offered Bishop the position and Bishop declined it, Bishop states that he was never offered the job. Bishop I Dep. 40-41. Fellers, who was present at the meeting between Poore and Bishop, also states that a part-time CSR position was not offered to Bishop. Fellers Dep. 15, 17.

  B.  ADA

Bishop alleges that T&H discriminated against him by terminating him based on a disability the company regarded him as having. T&H contends that Bishop fails to establish a prima facie case because he cannot show that the company regarded him as being substantially limited in one or more of his major life activities.

Congress passed the ADA "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2). The Act provides in part:

> No covered entity[8] shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). According to the Act the term "discriminate" includes:

> denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant.

42 U.S.C. § 12112(b)(5)(B).

In order to make out a prima facie case under the ADA, a plaintiff must show that: (1) he is within the ADA's protected class; (2) he was subjected to an adverse employment action; (3) at the time of the adverse employment action, he was performing his job at a level that met his employer's legitimate expectations; and (4) the alleged adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination. Haulbrook v. Michelin N. Am., 252 F.3d 696, 702 (4th Cir. 2001). Once the plaintiff states a prima facie case of disability discrimination, the burden shifts to the employer to offer evidence that the adverse action was taken for a legitimate, non-discriminatory reason. See Reeves, supra. If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual. Id. at 147.

The parties dispute whether Bishop has established the first prong of his prima facie case, that he had a disability under the ADA. The ADA defines a "disability," as "(A) a physical or

---

[8]T&H has not argued that it is not a covered entity.

mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). The determination of whether an individual is disabled is an individualized inquiry, particular to the facts of each case. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999). The question of whether a plaintiff meets the definition of disabled "is a question of law for the court, not a question of fact for the jury." Hooven-Lewis v. Caldera, 249 F.3d 259, 268 (4th Cir.2001).

Here, Bishop appears to be proceeding only on a "regarded as" theory of disability.[9] An individual may be "regarded as" disabled under the ADA if either "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. Sutton, 527 U.S. at 489. The employer, in other words, must entertain a misperception: "it must believe ... that [an individual] has a substantially limiting impairment when, in fact, the impairment is not so limiting." Id. The term "major life activities" refers "to those activities that are of central importance to daily life," including walking, seeing, hearing, and manual tasks that are "central to daily life." Toyota Mtr. Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002). When an employee asserts a subsection (C) claim that he was regarded as disabled, the analysis "focuses on the reactions and perceptions of the [employer's] decisionmakers" who worked with the employee. Runnebaum v. NationsBank of Md.,

---

[9]In his complaint, Bishop appears to allege that he was discriminated against based on an actual disability or a "regarded as" disability. He appears to now proceed only on a "regarded as" disability theory. See Plaintiff's Opposition Memorandum at 17-19 (discussing only a "regarded as" claim); Defendant's Motion for Summary Judgment at 2 ("Bishop [after filing this action] subsequently agreed that his colon cancer is not a disability under the [ADA] and that he is solely pursuing claims of age discrimination [] on the basis of a regarded as disability.")

17

N.A., 123 F.3d 156, 172-73 (4th Cir.1997), abrogated on other grounds by Bragdon v. Abbott, 524 U.S. 624 (1998).  The mere fact that an employer is aware of an impairment "is insufficient to demonstrate either that the employer regarded the employee as disabled [i.e., as having an impairment that substantially limits one or more of the major life activities of such individual] or that the perception caused the adverse employment action."  Id. at 174 (4th Cir. 1997)(citing Kelly v. Drexel University, 94 F.3d 102, 109 (3d Cir. 1996)).

Bishop fails to specify which major life activity(ies) T&H regarded him as not being able to perform.  He claims that T&H regarded him as disabled because Poore testified that colon cancer affected his (Poore) father's major life activities.[10]  Bishop argues that it could be implied from this that Poore regarded Bishop as disabled.  Bishop fails, however, to show that Poore's testimony that his father's colon cancer affected his father's major life activities translated into Poore believing that Bishop's colon cancer affected any of Bishop's major life activities.  Poore testified that he did not review any of Bishop's medical records or insurance papers regarding Bishop's cancer.  He merely testified that he knew that Bishop had surgery and heard that Bishop had to have chemotherapy.  Poore Dep. 38.  Bishop returned to his sales assistant job after his surgeries and during chemotherapy and he continued to perform that job.  Even if Poore regarded Bishop as being disabled from performing heavy lifting and/or traveling or that Bishop was restricted to a desk job,

---

[10]Poore testified that his father had melanoma and had to have his lymph nodes removed from his arm, then about four to six years later had bladder cancer in which he had a urostomy, two years later was diagnosed with colon cancer and had to have a colostomy, and passed away approximately nine months later.  Poore Dep. 36-37.  Poore thought that after his father's first two surgeries with lymphoma and bladder cancer, his father probably could have done some desk work, but could not have done a lot of heavy stuff.  He stated that his father was very active.  In response to the question "In your father's case –and I'm not talking about Barry, but in your father's case – there was no question that the colon cancer limited him in his major life activities," Poore responded "I would say yes."  Poore Dep. 39.

18

it does not establish that T&H regarded Bishop as being substantially limited in a major life activity (including the major life activity of working). It is not sufficient for him to show that T&H had a mistaken belief about whether he was "unable to perform the tasks associated with [his] specific job." Toyota Motor Mfg. Ky., Inc. v. Williams, 534 U.S. at 200-201. Further, Poore offered Bishop a job as a CSR when the sales assistant job was abolished, indicating that he did not regard Bishop as substantially limited in the major life activity or working. T&H provides that the job of CSR did not involve lifting or traveling. Defendant's Motion for Summary Judgment at 17.

Bishop may be attempting to assert that T&H regarded him as being disabled because the company made arrangements to cover portions of his job that required heavy lifting. A limitation on heavy lifting, however, does not constitute a significant restriction on one's ability to perform a major life activity. See Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346, 349 (4th Cir. 1996), cert. denied, Williams v. Avnet, 520 U.S. 1240 (1997)(a twenty-five pound lifting limitation does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity). Additionally, federal courts have held that an employer's decision to accommodate an employee or to place the employee on limited duty does not establish a "regarded as" claim under the ADA. See Forrisi v. Bowen, 794 F.2d 931 (4th Cir. 1986) (an employer does not necessarily regard an employee as disabled simply by finding the employee to be incapable of satisfying the singular demands of a particular job); Wooten v. Farmland Foods, 58 F.3d 382, 386 (8th Cir. 1995)(rejecting plaintiff's argument that he was perceived as disabled because he was restricted to light-duty work in certain settings); Muller v. Automobile Club of Southern California, 897 F. Supp. 1289, 1297 (S.D. Cal. 1995)(defendant's efforts to accommodate plaintiff's safety concerns and help her find other work did not show that defendant regarded her as having a disability).

19

T&H's motion for summary judgment should be granted as to Bishop's ADA claim. Bishop fails to establish a prima facie case under the ADA because he has not shown that T&H regarded him as having a disability.

## CONCLUSION

Based on the foregoing, it is recommended that Defendant's motion for summary judgment (Doc. 20) be denied as to Plaintiff's claim that he was not hired or transferred into a part-time CSR position based on his age and the motion be granted as to the remainder of Plaintiff's claims.

Respectfully submitted,

s/Joseph R. McCrorey
United States Magistrate Judge

February 8, 2008
Columbia, South Carolina